**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 | : | MDL NO. 3163 |
| RECEPTOR AGONISTS (GLP-1 RAS) | : | |
| NON-ARTERITIC ANTERIOR ISCHEMIC: | | THIS DOCUMENT RELATES TO ALL |
| | : | CASES |
| OPTIC NEUROPATHY | : | |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | JUDGE KAREN SPENCER MARSTON |
| JOHN HERBERT LAHNANEN | : | COMPLAINT AND JURY DEMAND |
| | : | |
| | : | CIVIL ACTION NO.:_____ |
| *Plaintiff,* | : | |
| vs. | : | |
| | : | |
| ELI LILLY AND COMPANY | : | |
| LILLY USA, LLC | : | |
| | : | |
| *Defendants.* | : | |
| _____ | : | |

**COMPLAINT AND JURY DEMAND**

**DIRECT FILING ORDER AND VENUE**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, and privileges, and obligations of the Direct Filing Order and other Orders of the Court.  Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Eastern District of Pennsylvania as Plaintiff's venue ("Original Venue").  Plaintiff makes this selection based upon one (or more) of the following factors:

__Plaintiff currently resides in Ashtabula, OH_.

__Plaintiff purchased and used Defendant(s)' products in Ashtabula, OH.

__ The Original Venue is a judicial district in which Defendant Eli Lilly and Company et al. reside, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

1

X The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)):

Defendants routinely market their products at issue and conduct business related to their products at issue in the Eastern District of Pennsylvania.

__ There is no district in which an action may otherwise be brought under 28 USC § 1391, and the Original Venue is a judicial district in which Defendant Novo Nordisk, Inc. and/or Novo Nordisk A/S is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

Other reason (please explain): _____ .

## INTRODUCTION

Plaintiff, John Herbert Lahnanen, by and through the undersigned counsel, brings this complaint against Defendants Eli Lilly and Company and Lilly USA, LLC (hereinafter "Defendant" or "Eli Lilly"), for damages suffered by John Herbert Lahnanen, who was severely injured as a result of using Defendant's GLP-1 Trulicity~~Mounjaro~~, a prescription medication designed, researched, tested, manufactured, marketed, supplied, promoted, advertised, packaged, labeled, sold and/or distributed by Defendant to improve blood sugar (glucose) in adults with type 2 diabetes. In support thereof, Plaintiff alleges as follows:

## PARTIES

1.    At all relevant times hereto, Plaintiff John Herbert Lahnanen was a resident and citizen of the Ohio in the county of Ashtabula.

2.    Plaintiff was prescribed and took Trulicity~~Mounjaro~~ as directed by his physicians.

3.    As a result of his/~~her~~ use of Trulicity~~Mounjaro~~, John Herbert Lahnanen developed non-arteritic anterior ischemic optic neuropathy (NAION) and suffers severe physical and emotional injuries and radical changes to his lifestyle given his severe loss of sight.

2

4. Defendant Eli Lilly and Company is and at all relevant times has been an Indiana corporation with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana.

5. Defendant Lilly USA, LLC is and at all relevant times has been an Indiana LLC with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana, with at least one member who is a citizen of Indiana.

6. Defendants Eli Lilly and Company and Lilly USA, LLC are referred to collectively herein as "the Eli Lilly Defendants" or "Eli Lilly" or "Lilly."

7. Each of the Eli Lilly Defendants was the agent and employee of the other Eli Lilly Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Eli Lilly Defendants' actual and implied permission, consent, authorization and approval.

8. In collaboration amongst themselves, as part of their business, and at all relevant times, the Eli Lilly Defendants designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Trulicity~~Mounjaro~~.

9. ~~Mounjaro,~~Trulicity belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1RAs"). The active ingredient in ~~Mounjaro~~ Trulicity is known as ~~tirzepatide~~dulagltuide. Other drugs and active ingredients, including Ozempic (semaglutide)~~, and Trulicity (dulaglutide)~~ also fall within the GLP-1 RA class, based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

10.    Medications within the GLP-1RA class of drugs mimic the activities of physiologic GLP-1, a gut hormone that binds to receptors throughout the body and, notably, activates GLP-1 receptors in the pancreas to stimulate the release of insulin and suppress glucagon.[1]

11.    GLP-1 RAs are designed to work similarly, to stimulate insulin production and reduce glucose production, but engineered to last longer than naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes.

12.    GLP-1 RAs are prescribed, for certain patient populations, to improve blood sugar (glucose) in adults with type 2 diabetes, reduce cardiac risk, and/or aid in chronic weight management.

13.    Defendants have acknowledged that gastrointestinal events are well known side effects of the GLP-1RA class of drugs.[2] However, Defendants have downplayed the nature, duration, extent, and seriousness of gastrointestinal events and failed to warn about other adverse events caused by their GLP-1RAs, even serious and devastating effects, including non-arteritic anterior ischemic optic neuropathy (NAION), which can result in blindness and permanent vision loss, and/or blurry and/or darkened vision, which may lead to falls and other injuries. Defendants have failed to provide adequate warnings about the risks of, among other things, NAION, all other, and its sequelae.

14.    The decision to target the American population for the sale of Defendants' GLP-1RAs was not accidental. Defendants understood the vast financial potential of marketing

---

[1] D. Hinnen, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) DIABETES SPECTR. 202-10 (Aug. 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/.
[2] *See, e.g.*, CT Jones, *Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell'*, Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (last visited on 9/26/23).

medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

15.     Defendants set on a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and thereby expanding the market for their drugs, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendants engaged in this conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for, and use of, GLP-1 RAs.

16.     By undertaking that effort, Defendants also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA, although they never would have done so if not for the off-label promotion of those drugs.

17.     Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

18.     Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug(s)); the drugs do not result in meaningful weight loss for up to

15% of people;[3] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[4] and a person will need to stay on these drugs for the rest of their lives to maintain the weight loss.[5] What is worse, Defendants kept this information hidden while actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight loss and management for most people.

19. The efforts to engrain GLP-1 RAs such as Ozempic, Wegovy, Mounjaro, Zepbound, and Trulicity in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs, both for people with diabetes, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label. Plaintiff would not have taken GLP-1 RAs if Plaintiff had been provided a full and clear warning of the true risks of taking these drugs.

20. Defendants' efforts to expand and grow the markets for treatment of diabetes and weight loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[6] This growth is a tremendous boon to GLP-1 RA makers but comes at a significant cost. Financially, it is expected that their lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add

---

[3] Erica Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, BECKER'S HOSPITAL REV. (Apr. 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[4] Gao, et al., *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials*, FRONTIERS IN PHARMACOLOGY 1 (2022).

[5] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES METAB. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

[6] J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), available at https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs#sectionheader#0.

$13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[7]

21.    The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment paths. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs would guarantee results and be efficacious and safe. Plaintiff and other users injected themselves with GLP-1 RAs believing that they were doing something to promote their health when, in fact, it had the opposite effect.

22.    As a result of the foregoing, Plaintiff has suffered and was diagnosed with injuries that were directly and proximately caused by regular and prolonged use of Trulicity~~Mounjaro~~. Plaintiff's injuries include, but are not limited to, non-arteritic anterior ischemic optic neuropathy (NAION).

23.    Upon information and belief, Defendants failed to warn physicians and the end users of Trulicity~~Mounjaro~~ of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

24.    Upon information and belief, Defendants failed to warn the end users of Trulicity~~Mounjaro~~ of the complications and devastating effects of which the company knew or should have known.

---

[7] Vanderbelit University Medical Center, *Cost of covering antiobesity drugs could be billions to Medicare despite, a new analysis finds* (Mar. 15, 2023), available at https://www.vumc.org/health-policy/medicare-antiobesity-medications-nejm.

25. Upon information and belief, Defendants' marketing was deceptive and misleading about the true risks associated with the use of Trulicity~~Mounjaro~~, risks which the companies knew or should have known.

26. At all relevant times, each Defendant conducted business and derived substantial revenue from its marketing, advertising, distributing, and selling of GLP-1 RAs within Indiana.

**JURISDICTION AND VENUE**

27. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of Texas, and each Defendant is neither incorporated nor has its principal place of business in Texas.

28. This Court has personal jurisdiction over Defendants consistent with the United States Constitution and 42 Pa. Consol. Stat. Ann. §5322 (Pennsylvania's "long arm" statute), as Plaintiff's claims arise out of Defendants' transaction of business, their tortious acts within the Commonwealth of Pennsylvania, their doing a series of similar acts for the purpose of thereby realizing pecuniary benefit, and by virtue of Defendants' substantial, continuous, and systematic contacts with the Commonwealth of Pennsylvania.

29. This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

30. Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this District. Defendants routinely market their products at issue in this District and conduct business in this District related to their products at issue in the Commonwealth of Pennsylvania.

**BACKGROUND**

**A.  Introduction to GLP-1 and GLP-1 RA Products**

31.      Researchers first discovered GLP-1 in hamsters in 1983.[8] It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans; and is produced naturally in the brain and intestinal wall of humans.

32.      In 1993, researchers discovered that a peptide from the venom of gila monsters activated GLP-1 receptors.[9] Gila monsters can go for months without eating but maintain stable blood sugar levels because they make very high levels of a glucagon peptide called exendin-4. Thus, the gila monster served as the inspiration for the GLP-1 RA class of drugs.

33.      Following the discovery that exendin-4 is similar in structure to GLP-1, a synthetic version of exendin-4 was developed to treat diabetes. This became the first GLP-1 drug, known as Byetta, with the active ingredient exenatide, which came to market in 2005. Byetta was initially brought to market as a collaboration between Eli Lilly and Amylin.[10] Whereas naturally-occurring GLP-1 has a short half-life of just a few minutes, Byetta's half-life was noted to be 2.4 hours.[11]

34.      Simultaneously with the development of exenatide, another company, Novo Nordisk (herewithin "Novo") was developing another GLP-1 drug called liraglutide. In the early 1990s, Novo researchers discovered that when they injected liraglutide into rats, it caused them to

---

[8] Bell, et al., *Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 NATURE 716 (1983).
[9] Thorens, et al., *Cloning and functional expression of the human islet glp-1 receptor*, 42 DIABETES 1678 (1993).
[10] News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), *available at* https://investor.lilly.com/news-releases/news-releasedetails/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited Nov. 8, 2023) (describing the drug as a "collaboration" between Amylin and Lilly).
[11] Cai, et al., *Long-acting preparations of exenatide,* DRUG DES. DEVEL. THER. (Sept. 2013).

stop eating almost entirely.[12] Liraglutide came to market in 2010, marketed initially as Victoza and later as Saxenda. Liraglutide has a half-life of 13-15 hours.[13]

35.    Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Novo as Ozempic, Wegovy, and Rybelsus), liraglutide (marketed by Novo as Saxenda, Victoza, and in combination with insulin as Xultophy 100/3.6), tirzepatide (marketed by the Lilly as Mounjaro and Zepbound), dulaglutide (marketed by Lilly as Trulicity), exenatide (marketed by various companies as Byetta, Bydureon, and Bydureon BCise), albiglutide (marketed by GlaxoSmithKline as Tanzeum), and lixisenatide (marketed by Sanofi as Adlyxin and in combination with insulin as Soliqua 100/33). The U.S. Food & Drug Administration ("FDA") recognizes GLP-1 RAs as a class of drugs based on similarities in their mechanisms of action, physiologic effects, and chemical structure.[14] Defendants likewise recognize that their GLP-1 RAs are members of the same class.[15]

36.    Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 in numerous ways,[16] including attaching to GLP-1 receptors, sending various signals in the

---

[12] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, NEW YORK TIMES (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html.

[13] Rubino, et al., *Effect of Weekly Subcutaneous Semaglutide vs Daily Liraglutide on Body Weight in Adults with Overweight or Obesity without Diabetes: The STEP 8 Randomized Clinical Trial,* JAMA (Jan. 2022).

[14] *See* FDA Ozempic Summary Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209637Orig1s000SumR.pdf at 8 (including liraglutide, dulaglutide, and semaglutide in the GLP-1 RA class) (last visited Jan. 2, 2025); *see also* FDA Mounjaro Clinical Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000MedR.pdf at 52 (results of tirzepatide toxicology studies in animals were typical of the GLP-1 RA pharmacologic class) (last visited Jan. 2, 2025); *see also* https://www.fda.gov/industry/structuredproductlabeling-resources/pharmacologic-class (last visited Dec. 28, 2023).

[15] SURMOUNT-1 Clinical Trial Protocol at 45, available at https://cdn.clinicaltrials.gov/largedocs/22/NCT04184622/Prot_000.pdf ("General safety characteristics of all studied doses of tirzepatide were similar to those of the GLP-1R agonist class…"); STEP-1 Clinical Trial Protocol at 15, accessible at https://cdn.clinicaltrials.gov/large-docs/35/NCT03548935/Prot_002.pdf ("[T]he tolerability and safety profile [of semaglutide] was overall consistent with… the GLP-1 RA class in general.").

[16] Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.

body, triggering a sensation of satiety (or perception of fullness, thereby curbing users' appetites and decreasing intake of calories and nutrients),[17] acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.[18]

37.     In contrast to naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes, GLP-1 RAs are engineered to last longer, as previously noted. The chemical structure of GLP-1 RAs includes a fatty chain that inhibits such quick dissolution. GLP-1 RAs such as semaglutide have a long half-life of well over 100 hours, causing the drugs to stay in the body for a month or more after the last dose.

38.     The GLP-1 RA at issue in this case, Trulicity~~Mounjaro~~, is a weekly injectable drug.

39.     Because the risks associated with GLP-1 RAs are common to the entire class of drugs, any evidence regarding the association between ileus, intestinal obstruction, NAION, and its sequelae and *any* GLP-1 RA (such as tirzepatide, exenatide, liraglutide, albiglutide, dulaglutide, lixisenatide, and semaglutide) should have put Defendants on notice of the need to warn patients and prescribing physicians of the risk of ileus, intestinal obstruction, NAION, and their sequelae associated with these drugs.

~~38.~~

---

[17] *See* Bloemendaal, et al., *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS,* J. ENDOCRINOLOGY (Apr. 2014).

[18] Deane, et al., *Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95(1) J. CLINICAL ENDO. METAB., 225-221 (January 1, 2010), available at https://academic.oup.com/jcem/article/95/1/215/2835243; American Society of Anesthesiologists, *Patients Taking Popular Medications for Diabetes and Weight Loss Should Stop Before Elective Surgery, ASA Suggests* (Jun. 29, 2023), available at https://www.asahq.org/about-asa/newsroom/news-releases/2023/06/patients-takingpopular-medications-for-diabetes-and-weight-loss-should-stop-before-elective-surgery.

**B. GLP-1 RAs Are Ineffective in Many Patients Due to High Discontinuation Rates, Minimal to No Weight Loss for Some Patients, and Rebound Weight Gain**

~~39.~~40. Many patients find GLP-1 RAs ineffective because they discontinue use of the drugs.

~~40.~~41. In May 2024, Blue Cross Blue Shield published an "Issue brief" that examined whether "patients prescribed [GLP-1 RAs] for weight loss are dropping out of treatment too quickly to attain the health benefits of these drugs." The company reviewed the behavior of nearly 170,000 GLP-1 RA users covered by Blue Cross Blue Shield and concluded that 30% of GLP-1 RA patients discontinued treatment within 4 weeks, that 58% of GLP-1 RA patients discontinued treatment within 180 days, and that patients who discontinue shortly after starting GLP-1 RA therapy are unlikely to see any health benefits.[19] As a result, Blue Cross Blue Shield of Michigan, the largest health insurer in the state, announced a plan to greatly restrict coverage for GLP-1 RA prescriptions, citing concerns about efficacy and safety.[20]

~~41.~~42. In June 2024, a real-world study of 4,066 insured GLP-1 RA weight-loss patients concluded that only 1 in 3 patients remained on GLP-1 RAs at one year, which "is substantially lower than what has been reported in clinical trials." The authors also concluded that the high discontinuation rates for GLP-1 RAs "create GLP-1 obesity treatment effectiveness concerns" because the value of the treatment "is not likely to be realized if [the GLP-1 RA] is discontinued during the first year and weight loss is not achieved or maintained."[21]

---

[19] *Real-world trends in glp-1 treatment persistence and prescribing for weight management*, Blue Health Intelligence Issue Brief (2024), available at https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.
[20] Blue Cross Blue Shield of Michigan, *Changes coming for select weight loss drugs for some commercial members* (Jul. 2024), available at https://www.bcbsm.com/content/dam/microsites/corpcomm/provider/the_record/2024/jul/Record_0724h.html.
[21] P. Gleason, *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, J. MANAGED CARE + SPECIALTY PHARM. (Jun. 2024), available at https://www.jmcp.org/doi/10.18553/jmcp.2024.23332.

42.43. Published in March 2021, a study funded by Novo acknowledged that weight loss for semaglutide users is likely to plateau between weeks 60 and 68 and that patients who discontinued use of semaglutide "gradually regained weight."[22]

43.44. Another study funded by Novo, which was published in February 2022, concluded that withdrawal of once-weekly semaglutide "led to most of the weight loss being regained within 1 year."[23]

44.45. A systematic review and network meta-analysis published in January 2024 reported that the effects of GLP-1 RAs on body weight gradually decline during long term use, indicating "potential limitations of GLP-1 RAs for sustained long term weight loss efforts."[24]

45.46. There is also some percentage of people who do not respond to GLP-1 RAs for weight loss at all. Research suggests that approximately 14% of patients taking lost less than 5% of their body weight and one-third lost less than 10% of their body weight.[25]

---

[22] Rubino, et al., *Effect of Continued Weekly Subcutaneous Semaglutide vs Placebo on Weight Loss Maintenance in Adults with Overweight or Obesity: The STEP 4 Randomized Clinical Trial*, JAMA (Mar. 2021), available at https://jamanetwork.com/journals/jama/fullarticle/10.1001/jama.2021.3224.

[23] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, DIABETES OBES. METAB. (Feb. 2022), available at https://dompubs.onlinelibrary.wiley.com/doi/10.1111/dom.14725.

[24] Yao, et al., *Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ (Jan. 2024), available at http://dx.doi.org/10.1136/bmj-2023-076410.

[25] Carbajal, Erica, *Up to 15% of patients on weight loss drugs may be 'non-responders*, BECKER'S HOSPITAL REV. (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

46.47.  In contrast to GLP-1 RAs, studies show that bariatric surgery is highly effective to treat type 2 diabetes and obesity, and to improve mortality for such patients.[26] Not only is bariatric surgery far more effective, it is also safer[27] and more cost-effective[28] than GLP-1 RAs.

47.48.  Likewise, other, well-established, prescription and over-the-counter medications with FDA approval for weight loss are available and offer significantly lower risk profiles than GLP-1 RAs. For example, Orlistat, an over-the-counter medication, was FDA-approved for weight loss in 1999 and has been shown to reduce fat absorption by up to 30%. While associated with some gastrointestinal adverse effects, they are much less severe than those seen with GLP-1 RAs and include fatty stools, fecal urgency, incontinence, and increased defecation.[29] Similarly, a prescription appetite suppressant combining phentermine and topiramate has been approved since 2012 and has been shown effective for long-term weight loss. While contraindicated in pregnancy, other risks are generally non-severe and include dizziness, constipation, dry mouth, and inattention.[30]

---

[26] *See, e.g.*, Courcoulas, et al., *Long-term outcomes of medical management vs bariatric surgery in type 2 diabetes*, 331 JAMA 654 (2024) ("After 7 to 12 years of follow-up, individuals originally randomized to undergo bariatric surgery compared with medical/lifestyle intervention had superior glycemic control with less diabetes medication use and higher rates of diabetes remission."), available at https://pubmed.ncbi.nlm.nih.gov/38411644/; Syn, et al., *Association of metabolic-bariatric surgery with long-term survival in adults with and without diabetes: a one-stage meta-analysis of matched cohort and prospective controlled studies with 174772 participants*, 397 LANCET 1830 (2021) ("Median life expectancy was approximately 9.3 years (95% CI 7.1–11.8) longer for patients with diabetes in the surgery group than in the control group. […] Among adults with obesity, metabolic–bariatric surgery is associated with substantially lower all-cause mortality rates and longer life expectancy than usual obesity management."), available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00591- 2/abstract.
[27] *See, e.g.*, Dicker, et al., *Bariatric metabolic surgery vs glucagon-like peptide-1 receptor agonists and mortality*, JAMA OPEN (2024) (finding bariatric metabolic surgery to be "associated with a 62% reduction in mortality compared with GLP-1 RAs"), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2819703.
[28] *See, e.g.*, T. Reed, *Bariatric surgery found more cost-effective than GLP-1s*, AXIOS (Oct. 21, 2024), available at https://www.axios.com/2024/10/21/bariatric-surgery-more-cost-effective-glp1; Sanchez, et al., *Comparative Cost-Effectiveness Analysis of Bariatric Surgery and GLP-1 Receptor Agonists for the Management of Obesity*, NORTHWESTERN UNIV. FEINBERG SCH. MED., available at https://www.surgery.northwestern.edu/docs/edelstone-bendix-research-poster/2024-posters/Sanchez-Joseph.pdf.
[29] Filippatos, et al., *Orlistat-associated adverse effects and drug interactions: a critical review.* 31(1) DRUG SAF. 53-65 (2008).
[30] Lei XG, et al., *Efficacy and Safety of Phentermine/Topiramate in Adults with Overweight or Obesity: A Systematic Review and Meta-Analysis.* 29(6) OBESITY 985-94 (Jun. 2021).

48.49. Similarly, an alternate treatment of type 2 diabetes is Metformin. Johns Hopkins' "Patient Guide to Diabetes" describes Metformin as the "treatment of choice for type 2 diabetes."[31] This guide also describes Metformin as "very effective at controlling blood glucose and lowers A1C as much as 1.5%." The listed side effects include diarrhea and rare lactic acidosis. Meanwhile, "in studies of GLP-1 receptor agonists used alone or in combination with oral antihyperglycemic therapies, mean changes in A1C ranged from −0.8 to −1.7%"[32]

49.50. A meta-analysis of Metformin found "there is no significant risk of GI AEs associated neither with the dose size of metformin nor metformin treatment duration." This same study found "GLP-1 RA and acarbose were ranked as having the highest incidence of GI AEs."[33]

50.51. Therefore, GLP-1 RAs offer minimal increased benefit as it relates to diabetes while increasing the frequence of gastrointestinal adverse injuries.

## I.    Development of NAION and Its Sequela

31. Non-arteritic anterior ischemic optic neuropathy (NAION) is a medical condition involving damage to the optic nerve resulting in the loss of vision.

32. NAION is irreversible and permanent.

33. NAION falls within the category of an eye stroke.

34. NAION is untreatable and can lead to permanent blindness.

---

[31] Johns Hopkins staff, *Metformin*, available at https://hopkinsdiabetesinfo.org/medications-for-type-2-diabetes-metformin/.

[32] D. Hinnen, *Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes*, 30(3) DIABETES SPECTR. 202-10 (Aug. 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/.

[33] Nabrdalik, et al., *Gastrointestinal adverse events of metformin treatment in patients with type 2 diabetes mellitus: A systematic review, meta-analysis and meta-regression of randomized controlled trials*, 13 FRONT ENDOCRINOL. (Lausanne) 975912 (Sept. 14, 2022), doi: 10.3389/fendo.2022.975912, PMID: 36187122, PMCID: PMC9524196.

35.　While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

36.　"[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."

37.　Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.

38.　Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

39.　The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

40.　After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

41.　Some NAION patients lose complete vision with no recovery in affected eye(s).

42.　Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

16

43.     Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[34]

44.     About 15% of patients who have NAION in one eye eventually develop it in their other eye.[35]

45.     GLP-1 RAs are treated as an established pharmacologic class (EPC) by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar chemical structure.

46.     It has been known since at least 2016 that the human eye contains GLP-1 receptors.[36]

47.     Defendant knew or should have known of the causal association between the use of Trulicity Mounjaro and the risk of developing NAION and its sequelae, but they ignored it.

48.     The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

49.     The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[37]

---

[34] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy

[35] *Id.*

[36] 47 Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

[37] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

50.     A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[38]

51.     The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.[39]

52.     The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION.[40]

53.     A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[41]

54.     Defendant knew or should have known of the risk of NAION with use of Trulicity~~Mounjaro~~.

---

[38] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomised controlled trials, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of November 20, 2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.

[39] Id.

[40] Id.

[41] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma, (December 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited 12/18/2024); See also Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (December 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited 12/18/2024).

55.     Defendant conducts clinical trials and has access to case reports and medical literature that provides it with superior knowledge compared to the general public as to potential risks of its medications.

56.     For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[42]

57.     The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[43]

58.     Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

59.     The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide", authored by Hathaway *et al.*, involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese.[44]

---

[42] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.
[43] *Id.*
[44] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296

60.    Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[45]

61.    Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[46]

62.    Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[47]

63.    Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; $P < .001$; concordance correlation coefficient = 0.86).[48]

64.    The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*

20

and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[49]

65.    Acknowledging the pathogenesis or cause of NAION remains unknown. The authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[50]

66.    A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendant's own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[51] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[52] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is nearly a doubling of the risk.[53]

67.    On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[54]

---

[49] *Id.*

[50] *Id.*

[51] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab.* 2025; 27(2): 1005-1009. doi:10.1111/dom.16076

[52] *Id.*

[53] *Id.*

[54] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574

21

68.    This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[55] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[56]

69.    In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[57] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[58]

70.    "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[59]

71.    The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[60]

72.    Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[61]

---

[55] *Id.*
[56] *Id.*
[57] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*

73.    Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[62]

74.    In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[63]

75.    A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[64]

76.    The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[65]

77.    The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her right eye. Imaging performed on the right eye was consistent with NAION.

---

[62] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/

[63] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness

[64] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058

[65] *Id.*

78.    A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[66]

79.    Despite the growing number of articles, reports, and an investigation by PRAC of the Danish Medicines Agency, Defendant still provides no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic.

**II.    Defendant's Continuing Failure to Disclose the Risk of NAION and its Sequala**

80.    According to the Drugs@FDA website, the label for Mounjaro has been updated on at least sixteen (16) occasions since 2022, with the most recent update on January 20, 2026.[67] Despite the fact there are at least seventeen (17multiple) iterations of the TrulicityMounjaro label, Defendant's labels have not contained any warning or any information whatsoever on the increased propensity of Mounjaro Trulicity to cause NAION and permanent vision loss as suffered by Plaintiff.

81.    Furthermore, Defendant has failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting MounjaroTrulicity, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

---

[66] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.
[67] See Drugs@FDA: FDA-Approved Drugs, Mounjaro, https://www.accessdata.fda.gov/drugsatfda_docs/label/2026/215866s009lbl.pdf (last visited March 9, 2026).

82.    Nothing was or is stopping Defendant from adding a warning regarding the risk of NAION. Defendant could have at any time made "moderate changes" to the labels.

83.    Specifically, Defendant could have filed a "Changes Being Effected" ("CBE") supplement under Section 314.70(c) of the FDCA to make "moderate changes" to ~~Mounjaro's~~ Trulicty's label without any prior FDA approval.

84.    Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change." § 340.70(c)(6)(iii).

85.    On July 3, 2024, the Journal of the American Medical Association ("JAMA") – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[68]

---

[68] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

86.     The JAMA study referenced a potential causal mechanism, proposing that "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[69]

87.     The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[70]

**PARTY PLAINTIFF**

88.     Plaintiff, John Herbert Lahnanen is a resident of the state of Ohio and is currently 62 years old.

89.     On or around April 2022 he consulted with Doctor Elaina Williams to discuss options for diabetes management.

90.     As a result of this appointment, Dr. Willliams  prescribed John Lahnanen Trulicity.

91.     On or around August 2022, John Herbert Lahnanen developed Non-Arteritic Anterior Ischemic Optic Neuropathy in his right eye.

92.     On or around October 2022, John Herbert Lahnanen developed Non-Arteritic Anterior Ischemic Optic Neuropathy in his right eye.

93.     John Herbert Lahnanen stopped taking Trulicity.

94.     John Herbert Lahnanen continues to suffer visual disturbances.

---

[69] *Id.*

[70] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

95.    At all times material to the above, the Trulicity label failed to adequately warn John Herbert Lahnanen and his medical provider of the true risks of taking Trulicity.

96.    At all times material to the above, the marketing and advertising failed to adequately warn John Herbert Lahnanen and his medical providers of the true risks of taking Trulicity.

97.    His life is forever changed because of his usage of Trulicity.

98.    John Herbert Lahnanen will never see clearly again as a result of his usage of Trulicity.

99.    Defendant knew or should have known that use of dulaglutide could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

100.    Defendant continues to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

101.    Defendant's Trulicity~~Mounjaro~~ was at all times utilized and prescribed in a manner foreseeable to Defendant.

102.    Plaintiff used Trulicity~~Mounjaro~~, and did not misuse, or alter Trulicity~~Mounjaro~~ in an unforeseeable manner.

103.    Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

104.    As a result of Defendant's actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendant's conduct.

27

105.    As a direct result of being prescribed and using Trulicity~~Mounjaro~~, Plaintiff has been permanently and severely injured, having suffered serious consequences.

106.    As a direct and proximate result of his Trulicity~~Mounjaro~~ use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

107.    Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Trulicity ~~Mounjaro~~ was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

108.    Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Trulicity~~Mounjaro~~, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of his Type II diabetes.

109.    Plaintiff's life is forever changed as a result of Defendant's actions and inactions.

**COUNT I**
**STRICT LIABILITY – FAILURE TO WARN**
**(Pursuant to Applicable Product Liability Law)**

110.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

111.    ~~Mounjaro~~ Trulicity is a product within the meaning of Pennsylvania products liability law.

112.    At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing,

and/or promoting Trulicity~~Mounjaro~~ and placed these drugs into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

113.    Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance and pharmacovigilance.

114.    Defendant, as a manufacturer, distributer, and marketer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field, and further, Defendant knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Trulicity~~Mounjaro~~ were inadequate.

115.    Plaintiff did not have the same knowledge as Defendant and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

116.    Defendant had a duty to provide adequate warnings and instructions for Trulicity~~Mounjaro~~, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their products.

117.    Defendant had a continuing duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with Trulicity~~Mounjaro~~, as it became or could have become available to Defendant.

118.    Defendant marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drugs, Trulicity~~Mounjaro~~, to health care providers empowered to prescribe and dispense Trulicity~~Mounjaro~~ to consumers, including Plaintiff, without adequate

29

warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendant misled and continues to mislead the medical community about the risk and benefit balance of Trulicity~~Mounjaro~~, which resulted in permanent injuries to Plaintiff.

119.    Defendant knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that Trulicity~~Mounjaro~~ created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

120.    Despite the fact that Defendant knew or should have known that Trulicity~~Mounjaro~~ caused unreasonable and dangerous side effects, it continues to promote and market Trulicity ~~Mounjar~~o without providing adequate clinically relevant information.

121.    Defendant knew or should have known that consumers, Plaintiff, specifically, would foreseeably and needlessly suffer injury as a result of Defendant's failures.

122.    The Trulicity~~Mounjaro~~ supplied to Plaintiff by Defendant was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold. Defendant possessed knowledge and information confirming the defective and unreasonably dangerous nature of Trulicity~~Mounjaro~~ but, despite this knowledge and information, Defendant failed and neglected to issue adequate warnings that Trulicity~~Mounjaro~~ could cause serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendant has yet to issue any warnings or recommendations that patients taking Trulicity ~~Mounjar~~o undergo ophthalmological monitoring.

123.    Defendant's failure to provide adequate warnings or instructions rendered Trulicity ~~Mounjaro~~ unreasonably dangerous in that it failed to perform as safely as an ordinary

patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendant, and in that the risk of danger outweighs the benefits.

124.    Defendant continues to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

125.    Defendant failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of TrulicityMounjaro including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

126.    Defendant failed to provide adequate post-marketing warnings and instructions after Defendant knew or should have known of the significant risks of, among other things, potentially irreversible vision issues and optic nerve damage.

127.    Defendant continued to aggressively promote and sell TrulicityMounjaro even after they knew or should have known of the unreasonable risks of potentially irreversible vision issues and optic nerve damage from the drugs.

128.    Defendant had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to TrulicityMounjaro, and/or that there existed safer and or equally effective alternative drug products that do not pose this same risk.

129.    By failing to adequately test and research harms associated with TrulicityMounjaro, and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the true risk-benefit profile of TrulicityMounjaro and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with

31

use of Trulicity~~Mounjaro~~. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Trulicity~~Mounjaro~~ and should or could be reported as an adverse event.

130. The ~~tirzepatide~~ dulaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendant knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Trulicity~~Mounjaro~~, Defendant failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market and/or promote .

131. Trulicity~~Mounjaro~~ is defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendant had exercised all possible care in their preparation and sale.

132. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Trulicity~~Mounjaro~~ could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendant provided reasonable instructions or warnings of these foreseeable risks of harm.

133. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and dangerous nature of Trulicity~~Mounjaro~~, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic

losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT II**

**STRICT LIABILITY – DESIGN DEFECT**
**Pursuant to Applicable Product Liability Law**

134.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

135.    At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity~~Mounjaro~~, and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

136.    Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting adverse events, label changes, post-market surveillance, and pharmacovigilance.

137.    Defendant, as a manufacturer, designer, distributer, and marketer of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to the Plaintiff.

138.    Trulicity~~Mounjaro~~ is designed in such a way that posed an unreasonable risk of permanent vision loss and optic nerve injuries and was kept on the market despite being in a defective condition.

139.    Defendant knew or should have known the Trulicity~~Mounjaro~~ they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that they posed a serious risk of severe and permanent vision and optic nerve injuries.

140.    Defendant had a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

141.    Defendant sold, marketed and distributed products that are unreasonably dangerous for their normal, intended, and foreseeable use.

142.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Trulicity~~Mounjaro~~, a defective product which created an unreasonable risk to the health of consumers, and Defendant is therefore strictly liable for the injuries sustained by Plaintiff.

143.    The Trulicity~~Mounjaro~~ supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendant, posing a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

144.    The Trulicity~~Mounjaro~~ taken by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it is sold.

34

145.    The Trulicity~~Mounjaro~~ taken by Plaintiff was in a condition not contemplated by the Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent vision loss and optic nerve damage.

146.    Trulicity~~Mounjaro~~ is a medication indicated for treatment of type 2 diabetes. Trulicity~~Mounjaro~~ in fact causes serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION, in one or both eyes, harming Plaintiff and other consumers.

147.    Plaintiff, ordinary consumers, and prescribers would not expect a diabetes drug designed, marketed, and labeled for weight loss and marketed for its supposed health benefits to cause irreversible vision issues and optic nerve damage.

148.    The Trulicity ~~Mounjaro~~ supplied to Plaintiff by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and optic nerve damage to Plaintiff and other consumers.

149.    The Trulicity~~Mounjaro~~ supplied to Plaintiff by Defendant was defective in design or formulation in that its alleged benefits did not outweigh the risks of serious and potentially irreversible vision issues and optic nerve damage posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Trulicity~~Mounjaro~~ makes the product unreasonably dangerous.

150.    Trulicity's ~~Mounjaro's~~ design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner.  It was more dangerous than Plaintiff expected.

151.    The intended or actual utility of TrulicityMounjaro is not of such benefit to justify the risk of optic nerve damage that may be irreversible and permanently disabling thereby rendering the product unreasonably dangerous.

152.    The design defects render TrulicityMounjaro more dangerous than other drugs and therapies designed to treat type 2 diabetes and obesity and cause an unreasonable increased risk of injury, including, but not limited, to potentially irreversible vision issues and optic nerve damage.

153.    Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that TrulicityMounjaro created a risk of serious and potentially irreversible vision issues, severe optic nerve damage, sudden blindness, and NAION in one or both eyes.

154.    TrulicityMounjaro is defective and unreasonably dangerous to Plaintiff and other consumers in that, despite knowledge that TrulicityMounjaro use could result in vision issues, Defendant failed to adequately test or study the drugs, including but not limited to: pharmacokinetics and pharmacodynamics of the drugs, its effects on vision and the optic disc, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

155.    Defendant acted unreasonably in its design of TrulicityMounjaro in that Defendant failed to adopt a safer design for the product that was practical, feasible, and otherwise a reasonable alternative design or formulation that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

36

156. Defendant knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Trulicity's~~Mounjaro's~~ defective design.

157. Trulicity~~Mounjaro~~ is defective and unreasonably dangerous to Plaintiff and other consumers even if Defendant had exercised all possible care in the preparation and sale of these products.

158. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity~~Mounjaro~~, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT III**
**<u>NEGLIGENT FAILURE TO WARN</u>**

159. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

160. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity~~Mounjaro~~ and placed this drug into the stream of commerce in a

defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

161. Defendant, as the holder of the NDA, is responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

162. Trulicity~~Mounjaro~~ was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

163. Defendant owed Plaintiff and other Trulicity~~Mounjaro~~ users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Trulicity~~Mounjaro~~.

164. At all times material, Trulicity~~Mounjaro~~ was used in a manner intended and/or foreseeable to Defendants.

165. A reasonable patient or consumer of Trulicity~~Mounjaro~~ would expect the drug to be free of significant defects.

166. Defendant knew or had reason to know of facts establishing that Trulicity~~Mounjaro~~ could cause NAION and failed to warn of the risk.

167. At all times relevant hereto, the defective nature of Trulicity~~Mounjaro~~ was known to Defendant, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Trulicity~~Mounjaro~~, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

168.    In disregard of its duty to timely warn consumers of health risks associated with Trulicity~~Mounjaro~~, Defendant committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Trulicity~~Mounjaro~~ was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monioring was necessary.

169.    At all relevant times, the label for Trulicity~~Mounjaro~~ was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

170.    At all relevant times, the label for Trulicity~~Mounjaro~~ was inadequate because it did not warn and/or adequately warn that Trulicity~~Mounjaro~~ had not been sufficiently and/or adequately tested for safety risks, including NAION.

171.    The labels for Trulicity~~Mounjaro~~ were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Trulicity~~Mounjaro~~.

172.    Defendant's failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

173.    Defendant's failure to warn of the significant risks of Trulicity ~~Mounjaro~~ use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Trulicity~~Mounjaro~~.

39

174.    Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Trulicity~~Mounjaro~~, Plaintiff would not have elected to begin and/or continue Trulicity~~Mounjaro~~.

175.    Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

176.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity~~Mounjaro~~, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT IV**
**NEGLIGENCE**

177.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

178.    At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity~~Mounjaro~~ and placed this drug into the stream of commerce in a

defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

179.    Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

180.    At all relevant times, Defendant had a duty to exercise reasonable care in the manufacture, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of TrulicityMounjaro products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

181.    Defendant failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of TrulicityMounjaro in that Defendant knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

182.    Defendant had no reason to believe that intended and foreseeable users of TrulicityMounjaro, such as Plaintiff, would realize the potential harm from use of these products.

183.    Defendant failed to exercise reasonable care to inform users, such as Plaintiff, of Trulicity'sMounjaro's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

184.    Defendant breached its duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of TrulicityMounjaro.

41

185.    In disregard of its duty, Defendant committed one or more of the following negligent acts or omissions:

    a.    Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Trulicity~~Mounjaro~~ without thorough and adequate pre- and post-market testing of the products;

    b.    Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Trulicity~~Mounjaro~~ while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Trulicity~~Mounjaro~~;

    c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Trulicity~~Mounjaro~~ was safe for their intended use;

    d.    Failing to disclose and warn of the product defect to the medical community, and consumers that Defendant knew and had reason to know that Trulicity~~Mounjaro~~ was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

    e.    Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Trulicity's~~Mounjaro's~~ risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

    f.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Trulicity~~Mounjaro~~;

    g.    Advertising, marketing, and recommending the use of Trulicity~~Mounjaro~~, while concealing and failing to disclose or warn of the dangers known by Defendant to be connected with, and inherent in, the use of this product;

    h.    Representing that Trulicity~~Mounjaro~~ was safe for its intended use when in fact Defendant knew and should have known the product were not safe for their intended purpose;

    i.    Continuing to manufacture and sell Trulicity~~Mounjaro~~ with the knowledge that Trulicity~~Mounjaro~~ is unreasonably unsafe and dangerous;

    j.    Failing to use reasonable and prudent care in the design, research, testing,

manufacture, and development of Trulicity~~Mounjaro~~ so as to avoid the risk of serious harm associated with the use of tirzepatide. Failing to design and manufacture Trulicity ~~Mounjaro~~ so as to ensure these drugs were at least as safe and effective as other similar products;

k.    Failing to design and manufacture Trulicity~~Mounjaro~~ was reasonably safe for their intended purpose in violation of objective safety standards;

l.    Failing to ensure that Trulicity~~Mounjaro~~ were accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m.   Failing to ensure that Trulicity~~Mounjaro~~ were accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Trulicity~~Mounjaro~~ and that use of tirzepatide created a high risk of severe, permanent injuries to vision; and

n.    Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Trulicity~~Mounjaro~~.

186.    A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

187.    As a direct and proximate result of the Defendant's negligent testing, monitoring, and pharmacovigilance of Trulicity~~Mounjaro~~, Defendant introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

188.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity~~Mounjaro~~, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and

43

aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT V**
**NEGLIGENT MISREPRESENTATION AND MARKETING**

189.   Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

190.   At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting TrulicityMounjaro and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendant.

191.   Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

192.   At all relevant times, Defendant negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning TrulicityMounjaro, including, but not limited to, misrepresentations regarding the safety and known risks of TrulicityMounjaro.

193.   The information distributed by the Defendant to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials,

44

print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Trulicity~~Mounjaro~~.

194.    Defendant's conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Trulicity ~~Mounjaro~~ and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Trulicity~~Mounjaro~~.

195.    Defendant's intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Trulicity~~Mounjaro~~ and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Trulicity~~Mounjaro~~.

196.    Defendant had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Trulicity~~Mounjaro~~, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

197.    Defendant made continued omissions in the Trulicity~~Mounjaro~~ labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

198.    Defendant made additional misrepresentations beyond the product labeling by representing Trulicity~~Mounjaro~~ as a safe and effective treatment for type 2 diabetes with only minimal risks.

45

199.    Defendant misrepresented and overstated the benefits of Trulicity~~Mounjaro~~ to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

200.    In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Trulicity~~Mounjaro~~, thereby causing Plaintiff to endure severe and permanent injuries.

201.    In reliance upon the false and negligent misrepresentations and omissions made by the Defendant, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Trulicity ~~Mounjaro~~ use before it was too late. Defendant knew or should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendant.

202.    Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Trulicity~~Mounjaro~~ had the true facts not been concealed by the Defendant.

203.    Defendant had sole access to many of the material facts concerning the defective nature of Trulicity~~Mounjaro~~ and its propensity to cause serious and dangerous side effects.

204.    At the time Plaintiff was prescribed and administered Trulicity~~Mounjaro~~, Plaintiff and Plaintiff's healthcare providers were unaware of Defendant's negligent misrepresentations and omissions.

205.    The Defendant failed to exercise ordinary care in making representations concerning Trulicity~~Mounjaro~~ while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in

46

interstate commerce, because the Defendant negligently misrepresented Trulicity's~~Mounjaro's~~ risk of unreasonable and dangerous adverse side effects.

206. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendant, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Trulicity~~Mounjaro~~.

207. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

208. As a direct and proximate result of reliance upon Defendant's negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**

209. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

210. At all relevant times, Defendant engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Trulicity ~~Mounjaro~~ and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control

47

and supervision of Defendant.

211. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

212. Defendant expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendant and/or its authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that TrulicityMounjaro was safe, effective, fit and proper for its intended use.

213. TrulicityMounjaro materially failed to conform to those representations made by Defendant, in package inserts and otherwise, concerning the properties and effects of Trulicity, Mounjaro, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendant constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning TrulicityMounjaro sold to Plaintiff.

214. Defendant expressly warranted that Trulicity Mounjaro was safe and well-tolerated. However, Defendant did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that TrulicityMounjaro was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

215. TrulicityMounjaro does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

216. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Trulicity Mounjaro, and Defendant's representations became part of the basis of the bargain.

217. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendant's representations that Trulicity~~Mounjaro~~ was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

218. Plaintiff's healthcare providers justifiably relied on Defendant's representations through Defendant's marketing and sales representatives in deciding to prescribe Trulicity~~Mounjaro~~ over other alternative treatments on the market, and Plaintiff justifiably relied on Defendant's representations in deciding to purchase and use the drug.

219. Plaintiff purchased and used Trulicity~~Mounjaro~~ without knowing that drug is not safe and well-tolerated, but that Trulicity~~Mounjaro~~ instead causes significant and irreparable vision loss and eye damage.

220. As a direct and proximate result of Defendant's conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Trulicity~~Mounjaro~~, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT VII
## BREACH OF IMPLIED WARRANTY

221. Plaintiff incorporates by reference each and every preceding paragraph as though

fully set forth herein.

222. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting TrulicityMounjaro, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

223. Defendant, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

224. Defendant was the seller of TrulicityMounjaro and sold TrulicityMounjaro to be taken for treatment of type 2 diabetes.

225. When TrulicityMounjaro was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

226. Defendant impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

227. Defendant breached their implied warranties of the Trulicity Mounjaro product because the TrulicityMounjaro sold to Plaintiff was not fit for its ordinary purpose to help improve blood sugar (glucose).

228. TrulicityMounjaro would not pass without objection in the trade; they are not of fair average quality; they are not fit for their ordinary purposes for which the products are used; were not adequately contained, packaged and labeled; and fail to conform to the promises or

50

affirmations of fact made on the container or label.

229.    Defendant's breach of their implied warranties resulted in use of the unreasonably dangerous and a defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT VIII**
**VIOLATION PENNSYLVANIA UNFAIR TRADE PRACTICES / CONSUMER FRAUD ACT (73 P.S. SECT. 201-1) AND/OR PA CONSUMER PROTECTION ACT**

230.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

231.    Plaintiff purchased and used Trulicity~~Mounjaro~~ primarily for personal use and therefore suffered ascertainable losses as a result of Defendant's actions in violation of Pennsylvania Unfair Trade Practices/Consumer Fraud Act, 73 P.S. Sect. 201-1, *et seq.*

232.    Had Defendant not made affirmative misrepresentations, material omissions, and engaged in the deceptive conduct described herein, Plaintiff would not have purchased Trulicity~~Mounjaro~~ and would not have incurred damages.

233.    Defendant engaged in wrongful conduct while at the same time obtaining, under false pretenses, money from Plaintiff that would not have been paid had Defendant not engaged in unfair and deceptive conduct.

234.    Despite knowing the falsity and misleading nature of their claims, Defendant engaged in unconscionable commercial practices, deception, fraud, false promise,

51

misrepresentation and/or the knowing concealment, suppression or omission of material facts relative to the safety and efficacy of Trulicity~~Mounjaro~~.

235.    Defendant intended such actions to mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Trulicity~~Mounjaro~~.

236.    Such actions did, in fact, mislead patients, healthcare providers, and the general public with respect to the safety and efficacy of Trulicity~~Mounjaro~~.

237.    Defendant had a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of Trulicity~~Mounjaro~~.

238.    Defendant's deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including John Herbert Lahnanen constituted unfair and deceptive acts and trade practices in violation of Pennsylvania Unfair Trade Practices/Consumer Fraud Act, 73 P.S. Sect. 201-1, *et seq*.

239.    As a direct and proximate result of Defendant's conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Trulicity~~Mounjaro~~, John Herbert Lahnanen suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all

52

issues so triable as a matter of right.

**COUNT IX**
**PUNITIVE DAMAGES**

240.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

241.    The acts and omissions of Defendant described herein consisted of oppression, fraud, and/or malice, and were done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendants' officers, directors, and/or managing agents.

242.    Defendant's actions amounted to actual malice or reckless indifference to the likelihood of harm associated with their acts and omissions.

243.    Defendant sold TrulicityMounjaro to Plaintiff and other consumers throughout the United States despite their knowledge that Trulicity Mounjaro can cause the problems as set forth in this Complaint, thereby causing the severe and debilitating injuries suffered by Plaintiff.

244.    Defendant misled both the medical community and the public, including Plaintiff and his physicians, by making false representations about the safety and effectiveness of TrulicityMounjaro and by failing to provide adequate instructions concerning its use.

245.    Defendant downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of Trulicity Mounjaro despite available information demonstrating that drug could cause NAION and irreversible vision loss.

246.    Defendant was or should have been in possession of evidence demonstrating that TrulicityMounjaro use could cause NAION and irreversible vision loss. Nevertheless, Defendant continues to market TrulicityMounjaro by providing false and misleading information with regard to their safety and effectiveness.

247.    Defendant failed to provide warnings that would have dissuaded health care

53

professionals from using Trulicity~~Mounjaro~~, thus preventing health care professionals, including Plaintiff's prescribing physician, and consumers, including Plaintiff, from weighing the true risks against the benefits of using Trulicity~~Mounjaro~~.

248.    As a proximate result of Defendant's acts and omissions, Plaintiff was diagnosed with NAION and suffers from irreparable vision loss due to Plaintiff's use of Trulicity~~Mounjaro~~.

249.    As a result of Plaintiff's injuries, Plaintiff has endured substantial pain and suffering, has incurred significant expenses for medical care, and will remain economically challenged and emotionally harmed.

250.    Plaintiff has suffered and will continue to suffer economic loss and has otherwise been emotionally and economically injured.

251.    Defendant has engaged in conduct entitling Plaintiff to an award of punitive damages pursuant to Common Law principles.

252.    Defendant's actions were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

253.    Plaintiff's injuries and damages are severe, permanent and will continue into the future. As a result, Plaintiff seeks actual and punitive damages from the Defendant.

254.    Defendant's conduct was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

255.    Consequently, Defendant is liable for punitive damages in an amount to be determined by the jury.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally,

for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

256.    Defendant is estopped from relying on the statute of limitations defense because Defendant actively concealed information concerning known risks, side effects, and defects in TrulicityMounjaro. Instead of revealing such information to the FDA or the public, Defendant has continued to represent Trulicity Mounjaro as safe for its intended use.

257.    Defendant is and was under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with TrulicityMounjaro. Because of Defendant's purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such products, Defendant is estopped from relying on any statute of limitations defense.

## DEMAND FOR JURY TRIAL

258.    Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendant awarding the following:

1. A monetary award, sufficient to compensate Plaintiff for the following categories of damages:

    a.  actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

55

b.  actual and treble damages in such amount to be determined by this Court and as provided by law;

c.  exemplary and punitive damages sufficient to punish and deter Defendants and others from future wrongful practices;

d.  pre-judgment and post-judgment interest;

e.  costs including court costs, and other litigation expenses; and

f.  any other relief the Court may deem just and proper.

Dated:  July 2, 2026                    Respectfully Submitted,

*/s/ Jonathan Orent*
Jonathan Orent, Esq. (RI Bar # 7408)
Motley Rice LLC
40 Westminster St. 5th Fl.
Providence, RI 02903
Tel: (401)-457-7700
Fax: (401) 457-7708
jorent@motleyrice.com


*/s/ Grace Chandler*
Grace Chandler, Esq. (SC Bar #104097)
Motley Rice LLC
28 Bridgeside Blvd
Mount Pleasant, SC 29464
Tel: (843)-216-9000
Fax: (843) 216-9450
gchandler@motleyrice.com

*/s/ Michael G. Daly*
Michael G. Daly, Esq. (PA ID No. 309911)
Motley Rice LLC
Three Logan Square
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Tel: (267)-267-4740
Fax: (856) 667-5133
mdaly@motleyrice.com

*/s/ Joshua M. Neuman*
Joshua M. Neuman, Esq. (PA ID No. 322648)

56

Motley Rice LLC
Three Logan Square
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Tel: (267)-267-4740
Fax: (856) 667-5133
jneuman@motleyrice.com

*Attorneys for Plaintiff*

57